UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAUNA BUSSEY,

                Plaintiff,                CIVIL ACTION NO. 06-CV-12378-DT

        vs.                      DISTRICT JUDGE AVERN COHN

COMMISSIONER OF              MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.

_____/

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

This Court recommends that  Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 9), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 8), and that Plaintiff's Complaint be **DISMISSED.**

II.      PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§ 423, 1382.  The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Shauna R. Bussey filed an application for Disability Insurance Benefits (DIB) in September 2003 and Supplemental Security Income ("SSI") in October 2003.  (Tr. 28-30, 34, 458-61).  She alleged she had been disabled since December 1, 1999 due to high blood pressure, diabetes, and idiopathic anaphylaxis.[1]  *Id.*  Plaintiff's claims were initially denied in January 2004.  (Tr. 20-25, 462-66).

---

[1]      Anaphylaxis is "a type I hypersensitivity reaction . . . in which exposure of a sensitized individual to a specific antigen or hapten results in urticaria, pruritus, and angioedema, followed by vascular collapse and shock and often accompanied by life-threatening respiratory distress."  *Dorland's Illustrated Medical Dictionary* 73 (30th ed. 2003).  Idiopathic means of an unknown

Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 26-27). A hearing took place before ALJ Daniel Dadabo on February 16, 2005 and November 2, 2005. (Tr. 592-659). Plaintiff was represented by an attorney at the hearings. (Tr. 18-19, 477, 508, 594, 627). The ALJ denied Plaintiff's claims in an opinion issued on March 21, 2006. (Tr. 5-16). Plaintiff appealed the denial of her claims directly to this Court and both parties have filed motions for summary judgment.[2]

## III.   **MEDICAL HISTORY**

Plaintiff was brought to the North County Medical Center Emergency Room in February 1997. (Tr. 125-30). She was initially unresponsive in a car and was awakened with an ammonia capsule. Thereafter, Plaintiff became responsive. (Tr. 128). Plaintiff was covered in hives. She stated that she had broken out in a rash after using a liquid cleaner at work. However, she repeatedly broke out in hives even when not at work. Plaintiff also reported that she always had to be hospitalized when this happened and that it caused her to pass out in the past. *Id.* Plaintiff was treated and released in stable condition after two days. (Tr. 127, 130).

In 2000 Plaintiff was treated in the emergency room in June, September, October, and December for complaints of hives/rashes over her body with associated itching, swelling, and an occasional shortness of breath. (Tr. 239-81). In February 2001 Plaintiff returned to the emergency room for another allergic reaction accompanied by a scratchy throat. (Tr. 234-38)   Dr. Anthony Sairclough, who had treated Plaintiff on several occasions, completed a Michigan Disability Determination Service form in June 2001. He reported that Plaintiff's daily functioning was good.

_____

cause.

[2]      Plaintiff was permitted to seek federal court review of the ALJ's decision without first seeking Appeals Council review as it was a redesign prototype case that was randomly selected by the Commissioner "to test elimination of the request for review by the Appeals Council." *See* 20 C.F.R. §§ 404.966, 416.1466. Accordingly, there was no request for Appeals Council Review.

Upon examination, Plaintiff was oriented as time, place, and person.  Her memory was intact and she could recall information.  Dr. Sairclough further noted that Plaintiff had a good ability to perform calculations, identify similarities and differences between objects, and exercise judgment.  (Tr. 133-44).

Steven Kotsonis, D.O., conducted a consultative examination on August 8, 2001.  (Tr. 145-47). Plaintiff told Dr. Kotsonis that she had episodic swelling and hives over her whole body since 1996 and that her doctors did not know the cause.  (Tr. 145).  Plaintiff stated that she had 2 to 3 flare-ups per month.  During one hospitalization, an allergist had performed allergy testing but no etiology was discovered.  *Id.*  Range of motion studies were normal.  Plaintiff had no difficulty with ambulation and she had full grip strength with intact dexterity.  (Tr. 146).

On September 15, 2001 a state agency physician reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment form.  (Tr. 70-77).  The physician concluded that Plaintiff had the RFC to: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand/walk for about 6 hours in an 8-hour workday; and (3) sit for about 6 hours in an 8-hour workday.  (Tr. 71).

On September 25, 2001 Plaintiff's primary care physician had referred her to the St. John Eastwood Clinics for her anxiety (and for which Plaintiff was taking Paxil).  (Tr. 150).  Plaintiff sought assistance in uncovering the cause of her hive breakouts and in dealing with stress and anxiety.  *Id.* Plaintiff reported that she experienced hives on a daily basis but had severe hive outbreaks about 4-5 times per month for which she required paramedic assistance and/or hospitalization.  *Id.*  Plaintiff was diagnosed with a panic disorder without agoraphobia, was assigned a Global Assessment of Functioning "(GAF") score of 52[3], and was advised to begin outpatient therapy.  (Tr. 151-52).

---

[3]        "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning."  *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* ("DSMV-IV") (Text Revision 4th ed. 2000) at 32.

Between October 2001 and April 2002 Plaintiff attended therapy sessions with Dr. Bela Shah, a psychiatrist. (Tr. 155-64). Dr. Shah noted in November 2001 that Plaintiff had not been showing up for her scheduled appointments and that she had no excuse for it. (Tr. 160). Plaintiff's medication was changed because Plaintiff reported that the Paxil made her nauseous. *Id.* In December 2001 Plaintiff reported to Dr. Shah that she was applying for jobs but she was still having hives. According to Plaintiff, she could not walk to the mailbox without getting hives. Dr. Shah noted, however, that she had never seen hives on Plaintiff during her appointments. (Tr. 159). In February 2002 Plaintiff reported that Zyrtec had given her hives but she had not been hospitalized and she had not gone to the emergency room. (Tr. 157). Plaintiff stated the next month that she had not had an outbreak of hives since her last visit and had no hospitalizations. (Tr. 156). She indicated that she wanted to work 20 hours per week because she was bored at home. *Id.* Plaintiff also reported that she was taking her medication regularly with no side effects. *Id.* However, in April 2002, Plaintiff stated that she had a serious outbreak of hives and her heart rate had slowed and she went to the hospital. (Tr. 155). Plaintiff failed to show for an appointment in June 2002 and she was discharged from the treatment program. (Tr. 149, 154). Plaintiff's discharge diagnosis and GAF score remained unchanged.

After Plaintiff began her therapy, Dr. R. Kriauciunas, a stage agency psychologist, completed a Psychiatric Review Technique Form. (Tr. 78-91). Dr. Kriauciunas concluded that Plaintiff had an anxiety-related disorder that resulted in mild restrictions of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and possibly 2 to 3 episodes of decompensation. (Tr. 78, 83, 88). Dr. Kriauciunas also completed a Mental RFC Assessment form and concluded that Plaintiff was moderately limited in her ability to: (1) understand,

---

A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." (emphasis omitted). *Id.* at 34.

-4-

remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; and (4) respond appropriately to changes in the work setting. (Tr. 93-94). In light of these limitations, Dr. Kriauciunas determined that Plaintiff was capable of performing unskilled work involving simple tasks on a sustained basis. (Tr. 94).

Between April 2002 and November 2002 Plaintiff sought emergency room treatment for allergic reactions with an outbreak of hives and associated swelling and itching. Plaintiff was seen on two occasions in April 2002 at which time she was treated with corticosteroids and antihistamines. (Tr. 213-26). In May 2002 Plaintiff was admitted to the emergency room and referred for inpatient treatment due to complaints of acute anaphylaxis, shortness of breath, and angioedema. (Tr. 205-12). She was treated with corticosteroids, antihistamines, and Zantac and was discharged after a day. (Tr. 208). Plaintiff returned to the emergency room the next week with the same complaints and she was again treated with corticosteroids and antihistamines. (Tr. 200-04). Plaintiff was also prescribed an Epipen in addition to other medications. (Tr. 202). Plaintiff sought treatment at the emergency room for the same symptoms in June and November 2002. Plaintiff's treatment remained unchanged. (Tr. 186-90, 194-99).

Plaintiff returned to the emergency room for similar allergy attacks with an outbreak of hives in January, April, and May 2003. Plaintiff was again treated with corticosteroids and antihistamines, prescribed various medications including an Epipen, and released in stable condition. (Tr. 166-71, 174-78, 400-03).

Plaintiff began treatment with Dr. M.N. Savliwala on June 9, 2003 at the Allergy & Asthma Care center. (Tr. 283-84, 286-89, 292). Dr. Savliwala reported that Plaintiff's skin tests showed positive reactions to dust, mites, cats, mold, grass, trees, ragweed, mixed weeks, shellfish, lobster, oysters, scallops, and crab. (Tr. 568). Dr. Savliwala surmised that Plaintiff had idiopathic anaphylaxis. He

advised Plaintiff to avoid shellfish and codeine products and to carry two Epipens with her. Dr. Savliwala also prescribed Zyrtec and Zantac. *Id.* In July 2003 Plaintiff reported to Dr. Savliwala that she was feeling better but continued to have hives. She also stated that she did not experience any drowsiness or sedation as a result of her medication. (Tr. 282, 291). Dr. Savliwala recommended that Plaintiff begin venom immunotherapy because she showed sensitivity to insect stings. He also prescribed Singulair because it had proven helpful to patients with idiopathic anaphylaxis. Dr. Savliwala further recommended that Plaintiff be tested for mastocytosis. *Id.* In August and September 2003 Dr. Savliwala adjusted Plaintiff's medications. (Tr. 290). On September 20, 2003 Dr. Savliwala wrote a letter stating that Plaintiff had severe idiopathic anaphylaxis and multiple allergies that resulted in required immunotherapy, various medications, and trips to the emergency room. He therefore concluded that Plaintiff should be eligible for social security disability. (Tr. 285).

In January 2004 Elisa Foster, D.O., performed a consultative examination of Plaintiff at Defendant's request. (Tr. 452-54). Plaintiff informed Dr. Foster that she had diabetes for the past two years but only checked her blood sugar levels when she was "feeling funny." Her diabetes medication had never been adjusted and she had never been hospitalized for her diabetes. Nevertheless, Plaintiff reported that she had dizziness, polyuia, polydipsia, and paresthesias. A recent eye examination was normal. (Tr. 452). Plaintiff also told Dr. Foster that she had frequent episodes of hive outbreaks with constant itching and that she carried an Epipen for these episodes. *Id.* Plaintiff further indicated that she worked 16 to 20 hours per week and that she could continue to work. However, she stated that if her itching continued she might have to stop work temporarily. (Tr. 454). An examination showed that Plaintiff had a full range of motion, unimpaired grip strength, normal gait, and full dexterity. (Tr. 453). Dr. Foster reported that Plaintiff had documented severe idiopathic anaphlyaxis that was generally controlled but her chronic itching was uncontrolled. (Tr. 454).

-6-

A state agency enhanced examiner completed a second Physical RFC Assessment form after reviewing Plaintiff's updated medical records in January 2004. (Tr. 96-103). The examiner concluded that Plaintiff had the RFC to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk for about 6 hours in an 8-hour workday; (3) sit for about 6 hours in an 8-hour workday; and (4) occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 101).

In October 2004 Plaintiff went to the emergency room for difficulty breathing after having been exposed to new carpet and paint. (Tr. 525). She was treated with Ativan, Benadryl, Solu-Medrol and a Ventolin updraft, which improved her symptoms. (Tr. 526). Plaintiff was released in stable condition the same day with instructions to continue taking Zyrtec and to follow-up with her primary care physician. *Id.*

Plaintiff was hospitalized in February 2005 for possible pneumonia. (Tr. 512-24). At the time of admission, Plaintiff stated that her blood sugar levels were fine. (Tr. 512). Plaintiff was released in stable condition after three days. *Id.*

In October 2005 Plaintiff re-sought therapy at the Eastwood Clinics due primarily to family stressors. Plaintiff reported that she had not had any treatment since 2002. (Tr. 578-581). Plaintiff was diagnosed with an adjustment disorder (mixed) and assigned a GAF score of 50. The doctor recommended that Plaintiff undergo outpatient therapy twice a week with individual medicine review sessions. (Tr. 581). The record contains only one other medication review report dated November 2005. (Tr. 577).

## IV.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff was 36 years old when she testified before the ALJ. She had a 12th grade education.

(Tr. 595). Plaintiff testified that she took various medications for her medical conditions. (Tr. 596). She took Glucovance for her diabetes, Doxepin for her idiopathic anaphylaxis, Lovastatin for her cholesterol, Avaprop for her hypertension, and Albuterol, Singulair, and Avero for her asthma. (Tr. 596-97, 602). The medication made her jittery, sleepy, and nauseous. (Tr. 609-10).

At the time of the hearing, Plaintiff was working part-time as a food server at an assisted living home due to financial need. (Tr. 597-600). Plaintiff testified that her employer had threatened to fire her because she frequently missed work due to illness. (Tr. 597, 600). She estimated that she missed work about 3 to 4 times a month. (Tr. 600). Plaintiff also informed the ALJ that she had worked full-time for about a year in 1997 or 1998 as a hotel manager but lost her job because she frequently passed out after an allergic attack. (Tr. 606-07). Plaintiff told the ALJ that she had an attack about 3 times a month. She would wake up in the hospital without any recollection of what has happened. (Tr. 600-01). Consequently, Plaintiff indicated that she needed someone around her at all times. (Tr. 603). Prior to an attack, Plaintiff's body would become very hot, her hands and feet would swell, and she would break out in puss bumps all over her body. (Tr. 610). Plaintiff also stated that her asthma had been "acting up" lately and she had been hospitalized. However, the hospital had released her to attend the hearing. (Tr. 601). Plaintiff experienced asthma attacks 1-2 per week and the attacks were triggered by cold weather. (Tr. 602). Plaintiff testified that she had no control over her asthma attacks or her black-outs. Medications helped but were not completely effective. (Tr. 601). Plaintiff stated that she was non-functional for 4 days a week due to her medical conditions. (Tr. 602-03). Plaintiff further testified that she had been hospitalized approximately 6 or 7 times in the past 2 to 3 years due to black-outs. (Tr. 604).

Plaintiff testified that she could stand for 1 hour before she had to sit and could sit for about 30 minutes at a time. (Tr. 604-605). She could walk for 5 to 10 minutes but could not walk at all if it was cold outside. *Id.* Plaintiff also stated that she could lift no more than 10 pounds. (Tr. 605).

Plaintiff stated that she slept for about 5-6 hours a night because she did not feel well during the night. (Tr. 609). Consequently, she would forget a lot of things during the day. *Id.*

Plaintiff also told the ALJ that she recently received her driver's permit. (Tr. 595-96). She tried not to drive because she was still scared. Plaintiff estimated that she only drove about twice a week because she needed someone over 18 to be in the car with her when driving with a permit. (Tr. 603).

### B.      **Medical Expert Testimony**

Dr. Michael Carney, a clinical psychologist, testified as a medical expert at the November 2005 hearing. (Tr. 487, 628-39). Dr. Carney testified that the "panic attacks" referred to by Plaintiff's doctors appeared related to a medical rather than psychiatric condition. (Tr. 628). He stated that he had not encountered any patients with "panic attacks" as described by Plaintiff's doctors although some of the signs Plaintiff exhibited could qualify as a panic attack. (Tr. 629). Dr. Carney further testified that Plaintiff did not meet the listing requirements for any mental impairment based upon the evidence before him. (Tr. 631). He opined that Plaintiff had moderate difficulties with concentration and pace but only mild restrictions of daily living and mild difficulties with maintaining social functioning. (Tr. 631-32). Dr. Carney believed that Plaintiff would be able to perform simple tasks. (Tr. 633). He also testified that it would be significant that Plaintiff was able to work part-time because it meant that her attacks did not interfere with her mental performance. (Tr. 637).

-9-

Dr. Julian Freeman, who is Board certified in Internal Medicine with a specialty in Neurology, also testified as a medical expert at the November 2005 hearing.  (Tr. 484, 640-56).  Dr. Freeman testified that Plaintiff had poorly controlled diabetes with hypoglycemia.  (Tr. 640).  He indicated that hypoglycemia can significantly impair an individual's mental functioning.  *Id.*  Plaintiff also had a history of hives, which were generalized and occurred frequently, an overly active left heart ventricle, and likely some form of associated vasculitis.  (Tr. 640-41).  Dr. Freeman concluded that Plaintiff' hives were probably caused by either an inflammatory or vasculitic process although he could not confirm this diagnosis.  (Tr. 641, 647).  He also told the ALJ that medical literature dating back 125 years documents a relationship between panic or anxiety-like symptoms and diffuse hives and vasculitis.  (Tr. 641-42).  Documented incidents involved either an anxiety disorder that produced severe hives or severe hives that a caused a chemical reaction with symptoms similar to a panic or anxiety attack and which thereafter generated anxiety.  (Tr. 642).  Dr. Freeman also indicated that Plaintiff had moderately severe obesity.  (Tr. 642-43).

The ALJ asked Dr. Freeman whether Plaintiff's impairments met or equalled any listed impairment.  (Tr. 648).  Dr. Freeman then considered the criteria of Listing 8.05.  He categorized Plaintiff's skin condition as being atopic dermatitis with skin lesions (hives) and stated that her condition had lasted for more than 3 months.  (Tr. 648).  However, Dr. Freeman testified that the main issue was whether Plaintiff's hives met the definition of "extensive" as used in Listing 8.05.  He noted that the evidence showed that Plaintiff experienced breakouts of hives over her entire body and that they were acute episodic attacks which generally resolved within a few days.  Dr. Freeman further stated that Plaintiff's hives would be considered extensive in the medical community and by standard medical definitions.  Nevertheless, Dr. Freeman testified that Plaintiff did not display symptoms that conformed to the examples given in Listing 8.05 to explain the meaning of

-10-

2:06-cv-12378-AC-MKM   Doc # 12   Filed 04/24/07   Pg 11 of 21   Pg ID 729

"extensive" skin lesions. (Tr. 648-50). Dr. Freeman further stated that someone with Plaintiff's

medical condition may not have the stamina and ability to work full time even though that person

could work 15 to 20 hours per week. (Tr. 654). He noted that Plaintiff would physically be able to

perform the upper end of sedentary work, including standing/walking for 4 hours in a day in 1 hour

increments, sitting for 6 hours, and lifting/carrying 10 pounds occasionally and 5 pounds frequently.

However, Dr. Freemen stated that theoretically Plaintiff's biggest limitations would be mental ones

such as distractions resulting from intense itching combined with her low IQ and slow mentation.

(Tr. 651-52, 654). Dr. Freeman also indicated that Plaintiff's hypoglycemic episodes could cause her

to pass out if her blood sugar levels reached the 30s to high 40s. However, Dr. Freeman noted that

there was no concurrent documentation of Plaintiff's blood sugar levels being at this level at the

times of passing out. (Tr. 655-56).

> ### C. <u>Vocational Expert Testimony</u>

Ms. Glee Ann Kehr, a rehabilitation counselor, testified as a vocational expert at the

February 2005 hearing. (Tr. 467, 611-23). Ms. Kehr stated that generally a person who missed work

3 to 4 times per month would not be able to sustain employment.[4] (Tr. 616, 620-21).

Edward Pagella, another rehabilitation counselor, testified as a vocational expert at the

November 2005 hearing. (Tr. 480-81, 656-58). The ALJ asked Mr. Pagella what work would be

available for an individual who could stand and walk for up to 4 hours per an 8-hour workday,

continuously stand for no longer than 1 hour at a time, sit for up to 6 hours in an 8-hour workday,

and lift/carry 10 pounds occasionally and 5 pounds frequently. (Tr. 656). The same individual

required work that could be learned upon short demonstration. *Id.* Mr. Pagella testified that such an

individual could perform unskilled sedentary work in the manufacturing industry. (Tr. 656-57). In

---

[4]        The bulk of Ms. Kehr's testimony is not related to the issues on appeal.

-11-

the Oak Park/Detroit labor market, there are 1200 assembler jobs, 900 sorter jobs, and 1600 hand packer jobs that such an individual could perform.  (Tr. 657).  However, an individual who was off-task or unavailable for work 2 to 3 times a week would be terminated from employment because such a person was required to be on-task for 84 percent of the day.  (Tr. 657-58).

## V.   LAW AND ANALYSIS

### A.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  It is not the function of this court to  try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

**B.     FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

**C.     LAW AND ANALYSIS**

**1.     The ALJ's Findings**

The ALJ found at step one of the sequential analysis that Plaintiff had not engaged in substantial gainful employment since her alleged onset date.  (Tr. 10).  At step two, the ALJ determined that Plaintiff had the following severe impairments: status post October 2004 right 4th metacarpal fracture, type II diabetes mellitus, hypertension, asthma, moderate obesity, idiopathic anaphylaxis, history of

uterine fibroids, history of right renal calculus status post cystoscopy, panic attacks without agoraphobia, and lower than average intelligence. (Tr. 10-11). The ALJ further found at step three that Plaintiff's documented impairments did not meet or medically equal any listed impairment. (Tr. 11).

The ALJ thereafter concluded that Plaintiff had the RFC to: (1) lift/carry 10 pounds occasionally and 5 pounds frequently; (2) sit for 6 hours in an 8-hour workday; (3) stand/walk for 1 hour without interruption and for 4 hours in an 8-hour workday; and (4) handle simple work performed under a moderate degree of pressure. (Tr. 11). At steps four and five of the sequential analysis, the ALJ then determined that, based upon the VE's testimony, Plaintiff could not return to her past relevant work but could perform a significant number of jobs in the regional economy and was therefore not disabled. (Tr. 15).

2.    **Arguments**

Based upon the evidence as a whole, the ALJ determined that Plaintiff had the RFC to perform a wide range of unskilled, sedentary work. (Tr. 11). This determination was consistent with the opinions of Dr. Freeman and Dr. Carney to which the ALJ gave controlling weight. (Tr. 14). It was also significantly more restrictive than the physical RFC assessed by the state agency physician.[5]

Plaintiff's challenge to the ALJ's decision is two-fold. She asserts the ALJ erred in finding that she failed to meet the severity requirements of Listing 8.05 and in determining that she was less than fully credible. Because the ALJ's credibility finding is partially determinative of the Listing 8.05 issue, Plaintiff's credibility argument is addressed first.

Plaintiff asserts that the ALJ erred in assessing her subjective complaint that she experienced 3 to 4 episodes of anaphylactic and allergic reactions per month which were so severe that they rendered

_____

[5]    Plaintiff raises no challenges to the ALJ's assessment of her mental limitations.

-14-

her unable to work.[6] "It is well-established that pain alone, if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). A claimant's statements as to pain and other symptoms, however, will not alone establish that she is disabled. *See Walters*, 127 F.3d at 531; see also 20 C.F.R. § 404.1529(a). The Sixth Circuit has developed a two-prong test to evaluate a claimant's assertions of disabling pain:

> First, we must examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1 986)); see also 20 C.F.R. § 404.1529(a).

Notwithstanding the above, the ALJ cannot rely solely on the lack of objective medical evidence because the regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). In addition to the available objective medical evidence, the ALJ must therefore consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and

---

[6]      Plaintiff has not challenged any of the ALJ's other specific credibility findings.  (Tr. 12-14).

restrictions due to the pain.  *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F .3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Moreover, because pain is a largely subjective matter, an ALJ may properly consider the claimant's credibility in evaluating her complaints of disabling pain.  *See Walters*, 127 F.3d at 531. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.*  Furthermore, an ALJ's findings based on the credibility of the claimant are to be accorded great weight and deference.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence.  *See id.*

The ALJ found that Plaintiff suffered from underlying medical conditions that would reasonably be expected to produce the symptoms that Plaintiff alleged.  However, the ALJ concluded that Plaintiff's statements concerning the intensity, duration, and limiting effects of those symptoms were not entirely credible.  (Tr. 12).  In discussing Plaintiff's anaphylactic and allergic reactions, the ALJ found that Plaintiff experienced multiple acute anaphylactic and acute allergy attacks requiring emergency room intervention between June 2000 and May 2003.  (Tr. 12).  However, the ALJ further noted that there was no documented evidence that Plaintiff had required any form of medical intervention since May 2003 for her anaphylactic and allergic reactions.  He therefore concluded that, as noted by the state agency physicians in January 2004, Plaintiff's anaphylactic and allergic reactions were controlled (although her related itching was not) with use of an Epipen.[7] *Id.*

Plaintiff contends that the ALJ erroneously relied upon the state agency physician's opinion that Plaintiff's anaphylaxis and allergic reactions were controlled because the state physician did not support his opinion with any objective evidence.  The state physician's opinion was based upon the report of

---

[7]     The timing of Plaintiff's improvement also coincides with the beginning of Plaintiff's treatment with Dr. Savliwala.  (Tr. 283-84).

Dr. Foster who had performed a consultative examination in January 2004. Dr. Foster did not specifically note what evidence she relied upon in reaching her conclusion that Plaintiff's anaphylaxis and allergic reactions were controlled. However, the ALJ did not blindly rely upon the reports of the state agency physician and Dr. Foster. Rather, the ALJ conducted an independent analysis of the objective medical evidence and noted that it was consistent with the doctors' ultimate conclusions. Such an undertaking was consistent with the Regulations instructions to consider the medical evidence in its entirety, including the medical opinions of consultative and non-examining state agency physician. *See* 20 C.F.R. §§ 404.1527(d) and (f), 416.927(d) and (f).

Plaintiff acknowledges that she had not required emergency room treatment since May 2003. Nevertheless, Plaintiff argues that her lack of emergency room treatment was not dispositive of her ability to work. However, there is nothing in the ALJ's opinion to suggest that he relied solely upon Plaintiff's lack of emergency room treatment to find Plaintiff not disabled except to the extent such evidence was critical to the question of whether Plaintiff met the requirements of Listing 8.05. Indeed, Plaintiff has not alleged that the ALJ overlooked any objective evidence that would contradict the conclusion drawn by the ALJ or the state agency physicians. Plaintiff does state that she still experienced severe anaphylactic and allergic attacks in May 2005. However, this fact was not overlooked by the ALJ. Rather, the ALJ specifically noted that there was simply no objective proof that Plaintiff experienced any anaphylactic or allergic attacks since May 2003. (Tr. 12).[8] Furthermore, it was within

---

[8]        Dr. Scairlough's progress report from May 2005 indicates that Plaintiff was doing very well but that she "still gets allergic reactions that may necessitate use of an Epipen." (Tr. 531). Nevertheless, as noted by the ALJ, there is no evidence dated after May 2003 either within Dr. Scairlough's reports or elsewhere stating that Plaintiff sought medical assistance for her anaphylaxis or allergic reactions. Morever, Dr. Scairlough's report only reinforces the ALJ's conclusion that the use of an Epi-pen controlled Plaintiff's allergic reactions.

-17-

the ALJ's discretion to consider Plaintiff's treatment history (or lack thereof) in determining whether Plaintiff's claim as to the severity and frequency of her attacks was credible. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Plaintiff reported that she had attacks 3-4 times per month that were so severe that she was unable to work. The evidence showed that over a 5 ½ year period Plaintiff required emergency room treatment for her anaphylactic and allergic reactions on about 16 occasions. However, there is no evidence that during this time period Plaintiff sought any treatment for her condition on multiple occasions during the same month except for in April 2002, May 2002, and January 2003. Moreover, as noted above, there was no evidence that Plaintiff sought any medical treatment after May 2003. It was reasonable for the ALJ to conclude that this treatment history was inconsistent with Plaintiff's claim that during the entire period of alleged disability she was unable to work 3 to 4 times per work given the severity of her condition. Furthermore, this evidence provides substantial support for the ALJ's conclusion that Plaintiff's condition was under control by May 2003 because an almost 2 year period elapsed during which Plaintiff required no medical intervention for her anaphylactic/allergic reactions.

Plaintiff also alleges that the ALJ's step three determination that she did not have a Listed impairment was not supported by substantial evidence. Dr. Freeman characterized Plaintiff's skin condition as atopic dermatitis with hives. Defendant does not challenge this characterization. Atopic dermatitis is a listed impairment if it is accompanied by "extensive skin lesions that persist for at least 3 months despite continuing treatment." 20 C.F.R. Pt. 404, Supbt. P, App. 1, § 8.05 (2003). The Code of Federal Regulations define "extensive skin lesions" as "those that involve multiple body sites or critical body areas, and result in a very serious limitation."[9] *Id.* at § 8.00(C)(1).

_____

[9]        The Regulations provide a non-exhaustive list of examples of extensive lesions, such as those that: (1) interfere with the motion of joints or seriously limits the use of more than one

Plaintiff asserts that she met the criteria of Listing 8.05 based upon Dr. Freeman's testimony that Plaintiff had atopic dermatitis which: (1) involved Plaintiff's entire body; (2) had lasted for more than 3 months; (3) involved break outs several times a week; and (4) met the standard medical definition of "extensive". Consequently, Plaintiff contends that the ALJ erred by rejecting Dr. Freeman's opinion that she met the requirements of Listing 8.05 without an adequate explanation.

Dr. Freeman did not unequivocally opine that Plaintiff met Listing 8.05. When the ALJ indicated that he inferred Dr. Freeman had such an opinion, Dr. Freeman advised the ALJ that interpreting and applying Listing 8.05 was problematic in this case. (Tr. 648). Dr. Freeman did conclude that the general medical community would consider Plaintiff's hives to be "extensive" because she had experienced attacks several times a week for at least a period of three months and because Plaintiff's hives covered her entire body. However, Dr. Freeman further noted that Plaintiff's hives would not be considered "extensive" if analyzed under the examples used by the Regulations to define "extensive" skin lesions because the examples consistently referenced only lesions that resulted in functional limitations of the hands and feet. (Tr. 648-49).

Defendant argues that Plaintiff did not meet the requirements of Listing 8.05 because there was no evidence that Plaintiff suffered any of the functional limitations set forth in 20 C.F.R. Pt. 404, Supbt. P, App. 1, § 8.00(C)(1)(a) - (c). Indeed, Dr. Freeman did not opine that Plaintiff's hives interfered with her functional limitations and Plaintiff has not pointed to any evidence that would support such a finding. Furthermore, the only evidence relevant to this issue reflects that Plaintiff was not functionally

---

extremity; (2) exist on the palm of the both hands and which "very seriously" limit the ability to do fine and gross motor movement; and (3) exist on the soles of both feet and which "very seriously" limit the ability to ambulate. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.00(C)(1)(a) - (c).

limited although Plaintiff was not experiencing a hive breakout when she was examined by the physicians who assessed her functional abilities. [10] (Tr. 146, 453).

Nevertheless, the ALJ remarked that the requirements of Listing 8.05 were met if Plaintiff's anaphylactic and allergic reactions occurred as frequently as Plaintiff claimed.[11] (Tr. 11). The ALJ concluded, however, that the record did not support Plaintiff's claim. *Id.* As noted above, the ALJ's credibility analysis as to this issue was supported by substantial evidence.

## VI.    RECOMMENDATION

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 9) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 8) should be **DENIED** and her Complaint **DISMISSED**.

## VII.    NOTICE TO THE PARTIES

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931

---

[10]    Plaintiff's treating psychiatrist also noted that she had never seen Plaintiff with hives despite Plaintiff's claim that merely walking to her mailbox caused an outbreak. (Tr. 159).

[11]    Although not entirely clear from the ALJ's opinion, it is reasonable to conclude that the purpose of the ALJ's analysis was to determine if Plaintiff's condition was equal in severity to Listing 8.05. Such a conclusion would be consistent with Dr. Freeman's opinion that, if the severity of Plaintiff's condition were fully credited, the medical community would consider Plaintiff's hives to be extensive regardless of the examples set forth in § 8.00.

F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: April 24, 2007                              s/ Mona K. Majzoub
                                                   **MONA K. MAJZOUB**
                                                   **UNITED STATES MAGISTRATE JUDGE**

### PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: April 24, 2007                              s/ Lisa C. Bartlett
                                                   Courtroom Deputy